**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Kane Revit,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>First Advantage Tax Consulting Services, LLC,<br><br>　　　　　Defendant. | No. CV10-1653-PHX-DGC<br><br>**ORDER** |

Plaintiff Debra Kane Revit filed a complaint against her former employer, Defendant First Advantage Tax Consulting Services, LLC ("Defendant" or "First Advantage"), alleging violations of the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501 *et seq.*, and the common law prohibition against wrongful termination. Doc. 39. Defendant has move for summary judgment. Doc. 112. The motion is fully briefed. Docs. 112, 113, 118, 121. For the reasons that follow, the Court will grant the motion in part and deny it in part.[1]

**I.    Background.**

The following facts are undisputed. From approximately April 2005 to May 7, 2009, First Advantage employed Plaintiff. Doc. 39, at 1. Most recently, Plaintiff was a Vice President managing tax credit and incentive services, and oversaw a staff of 40 to 45

---

[1] Plaintiff's request for oral argument (Doc. 118) is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

professionals. *Id.*

On April 23, 2009, Plaintiff met with First Advantage president Beth Henricks and human resources representative Lisa Boan and notified them that the company had engaged in several violations of law and that corrective action was necessary. *Id.* at 2. Among other violations, Plaintiff reported that First Advantage wrongfully obtained tax credits knowingly reported to clients as legitimate, intentionally overbilled clients for work that had not been performed, pressured its public accountants to participate in dishonest, fraudulent, or negligent accounting practices, engaged and compensated Carl Cohen as a lobbyist without proper registration, and disclosed or failed to protect the confidential personal information of its clients' employees. *Id.*

On April 24, 2009, Plaintiff led a meeting with her staff. Doc. 114, at 25. The agenda included a bullet point on "Furlough Time." *Id.* During the ensuing discussion, one of Plaintiff's staff members asked if individuals in the upper levels of First Advantage "were feeling the pain" and stated that perhaps the organization could have avoided the furlough if executives took a cut in their bonuses. *Id.* at 26.

On April 26, 2009, Plaintiff sent an email to Kristy Hensley, a human resources generalist at First Advantage, and copied Henricks and Boan along with 30 members of her staff. Doc. 114, at 26. The subject line stated: "Tax Department Questions for HR: From Dept Mtg 4/24/09." *Id.* The body of the email read, in part: "Based on the proxy detail sent to stock owners['] homes, Anand Nallathambi received a raise and a bonus equal to roughly 2.5 million dollars[.] Can you please provide examples of how the most senior members of FADV (i.e. Anand Nallathambi) are experiencing the financial pressure that members of the tax consulting team are currently experiencing?" The email also stated, with respect to the low morale of the tax department: "the hit of all salary employees subject to the furlough could have been prevented by reducing the bonus/raise of just one member of the senior staff." *Id.* at 27-28. Boan opined that Revit exacerbated an already difficult situation by soliciting these responses and sending them to most of her team. *Id.* at 28-29. Henricks opined that Plaintiff's email was inappropriate for a

company leader.  *Id.* at 29.  First Advantage terminated Plaintiff's employment on May 7, 2009.  Doc. 39, at 3.

**II.     Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.    Plaintiff's AEPA Retaliation Claim.**

Plaintiff contends that Defendant violated the AEPA by firing her for reporting that First Advantage had engaged in conduct that she believed to be illegal.  Doc. 39, at 2. The AEPA provides, in pertinent part, that an employee has an actionable claim when:

> The employer has terminated the employment relationship of an employee in retaliation for any of the following:
>
> . . .
>
> (ii) The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent

further violations of the Constitution of Arizona or statutes of this state[.]

A.R.S. § 23-1501(3)(c); *Galati v. Am. W. Airlines, Inc.*, 69 P.3d 1011, 1013 (Ariz. App. 2003) (an employee may bring a wrongful termination action "when the employer terminates an employee in retaliation for refusing to violate Arizona law or for reporting violations of Arizona law to the employer's management or other investigative authority.") (citing A.R.S. § 23-1501(3)(c)(i), (ii)). To prevail, Plaintiff must establish that: (1) she had information or a reasonable belief that her employer or another employee had violated an Arizona statute or constitutional provision; (2) she disclosed the information or belief to an employer or a representative of the employer whom she reasonably believed was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) she was terminated because of the first two steps.

Defendant argues that it is entitled to summary judgment because Plaintiff did not engage in activity protected by the AEPA. Defendant also argues that Plaintiff cannot establish a causal link between the allegedly protected activity and her termination. Doc. 113, at 14-15.

### A.     Reasonable Belief of State Law Violation.

Defendant argues that Plaintiff did not engage in protected activity because virtually all of her complaints pertained to perceived violations of federal law, and the AEPA does not protect employees who refuse to violate, or report violations of, federal law. Doc. 113, at 14. *See Galati*, 69 P.3d at 1014 ("[T]he language [of Section 23-1501(3)(c)] plainly appears to contemplate only transgressions of Arizona law as violative of Arizona public policy."). Plaintiff claims that she identified the following actions as illegal at the April 23 meeting, and that she reasonably believed each of these to be a violation of Arizona law: (1) blindly signing off on credit memos without supporting documentation, (2) theft from clients through overbilling and duplicative billing, (3) misstatement of revenue on financial statements through overbilling and duplicative billing, (4) submitting tax credit paperwork after the deadline,

(5) compromising the social security numbers of clients' employees, (6) acting as a tax practitioner while violating applicable legal restrictions by charging contingency fees, and (7) paying Carl Cohen to lobby without being registered as a lobbyist. Doc. 118, at 4-9.

The AEPA requires only that Plaintiff have a "reasonable belief" that Defendant violated state law. A.R.S. § 23-1501(3)(c). An actual violation need not be proven. *See Murcott v. Best Western Int'l, Inc.*, 9 P.3d 1088, 1096 (Ariz. App. 2000). At the April 23 meeting with Henricks, Plaintiff made clear that she believed First Advantage was engaging in illegal activity. *See* Doc. 119, at 20-21 (PSOF ¶¶ 381-383, 385, 387). She voiced the importance of supporting documentation for a CPA, and went on to address failures to safeguard employees' Social Security numbers, overbilling clients, intentional mistakes in financial statements, Cohen lobbying as an unregistered lobbyist, and contingency fee issues. She told Henricks that "[e]very single one of these things is a problem and I believe every single one of these things is against the law." Doc. 120-2, at 66-67 (Revit Dep. 178:17-184:17).

Plaintiff does not claim to have specified the Arizona statutes that she believed were at issue, but she does claim that she believed Arizona laws were being violated. *See* Doc. 120-2, at 100 (Revit Decl. ¶ 21) ("With respect to the violations of law that I reported[,] I had a reasonable good faith belief that First Advantage and its employees were violating Arizona law as well as federal law and the law of other jurisdictions."). According to Plaintiff, premature and duplicative invoices constitute a deceptive business practice and a fraudulent scheme under the Arizona criminal code. Doc. 118, at 5 (citing A.R.S. §§ 13-2202(A)(2) (delivering less than the represented quantity of any service), 13-2310(A) (knowingly obtaining benefits through false representations)). Misstating revenue and making false statements in preparing tax returns and SEC filings likewise could violate Arizona law. Doc. 118, at 6 (citing A.R.S. § 13-2407(A)(3) (illegal to knowingly make false entries in records kept for government use or submitted to the government); §§ 42-1101, 1105(D) (requiring a company to keep records necessary to

determine income tax liability)).  In its reply, Defendant does not address Plaintiff's reasons for believing these activities violated Arizona law.  *See* Doc. 121.  Because the reported actions, along with others that Plaintiff has identified (Doc. 118, at 5-9), have elements that appear to be covered by Arizona law, Defendant has not shown as a matter of undisputed fact that Plaintiff's actions were not protected by the AEPA.

Furthermore, Plaintiff's state of mind presents a jury question.  As Arizona courts have noted, "absent a person's outright admission regarding [her] state of mind, [her] mental state must necessarily be ascertained by inference from all relevant surrounding circumstances."  *In re William G.*, 963 P.2d 287, 292 (Ariz. App. 1997).

**B.    Causation.**

Defendant argues causation under the *McDonnell Douglas* burden-shifting framework applied in Title VII cases.  *See* Doc. 113, at 13-14.  The Court could locate no Arizona case that has applied *McDonnell Douglas* to an AEPA retaliation claim under A.R.S. § 23-1501(3)(c)(ii), although some cases in this district have implicitly assumed that the Title VII approach applies.  *See Levine v. TERROS*, No. CV 08-1458-PHX-MHM, 2010 WL 864498, at *8-10 (D. Ariz. March 9, 2010); *Knox v. United Rentals*, No. CIV 07-0297-PHX-DKD, 2009 WL 806625, at *4-5 (D. Ariz. March 26, 2009).  A causal link in Title VII cases is established as follows: first, the plaintiff must "present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action"; second, the burden shifts to the defendant "to articulate some legitimate, non-retaliatory reason for the adverse action"; third, if the defendant meets this burden, "the plaintiff must then show that the asserted reason was a pretext for retaliation." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

There is another body of federal law that is closely analogous to AEPA claims. Retaliation for the exercise of First Amendment rights is analyzed using a two-part burden-shifting scheme: "an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination.  If the employee discharges that burden, the [defendant] can escape liability

by showing that it would have taken the same action even in the absence of the protected conduct." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

In the recent case of *Evers v. Safety Kleen Systems, Inc.*, No. CV 10-02556-PHX-NVW, 2012 WL 910392, at *10 (D. Ariz. March 19, 2012), Judge Wake considered whether Arizona courts would adopt a Title VII or First Amendment retaliation approach in AEPA retaliation cases. For two reasons, he concluded that a First Amendment retaliation approach would be used. First, that approach asks whether the protected speech was "a substantial or motivating factor" in the discharge, an inquiry that closely resembles the "substantial motivating factor" test applied by the Arizona Court of Appeals to a whistleblowing retaliation claim in *Murcott*, 9 P.3d at 1099.[2] Second, the First Amendment retaliation test asks whether an employer would have taken the same action in the absence of the employee's whistleblowing and thereby "ensures that employees will not blow the whistle simply to put themselves in a more secure position than they would have been otherwise." *Evers*, 2012 WL 910392, at *10 (citing *Mt. Healthy*, 429 U.S. at 285-286).

The Court agrees with Judge Wake that the First Amendment retaliation test adheres more closely to Arizona's standard for causation in retaliation cases than does a Title VII analysis. The Court also agrees that the test includes the advantages recognized by the Supreme Court in *Mt. Healthy*. *See* 429 U.S. at 285-286. For these reasons, the Court will apply the First Amendment retaliation standard to the causation element of

---

[2] The plaintiff in *Murcott* was discharged in 1995, just before the AEPA became effective, but cases in this district have continued to apply the *Murcott* causation analysis to AEPA claims. *See, e.g.*, *Gray v. Motorola, Inc.*, No. CV 07-1466-PHX-MHM, 2009 WL 3173987, at *17 (D. Ariz. Sept. 30, 2009); *Cutrona v. Sun Health Corp.*, No. CV 06-2184-PHX-MHM, 2008 WL 4446710, at *15 (D. Ariz. Sept. 30, 2008). The Court has not located any Arizona case that has addressed the applicability of *Murcott* to AEPA claims, but has no reason to conclude that Arizona courts will abandon the "substantial motivating factor" test for causation. The AEPA established specific categories of discharge that give rise to wrongful termination, but it did not purport to create a new test for causation. The Court therefore relies on the statutory text of § 23-1501(3)(c)(ii) for the elements of an AEPA retaliation claim, and on *Murcott* for the analysis of causation in such a claim. Plaintiff agrees that the *Murcott* test applies. *See* Doc. 118, at 10.

Plaintiff's AEPA claim.

### 1. First Step.

According to Defendant, Plaintiff cannot show that her complaints at the April 23 meeting were a substantial motivating factor in her termination. Doc. 15, at 18. Defendant asserts that Plaintiff had reported various acts she believed to be unlawful or fraudulent long before the April 23 meeting, *see* Doc. 114, at 37 (DSOF ¶ 283); Doc. 115-4, at 29 (Revit Appeals Board Testimony that she reported various unlawful and fraudulent acts "[o]ver the course of my reporting to [Henricks] directly or indirectly"), and yet received positive treatment from Henricks after these reports, *see* Doc. 114-8, at 2-10 (DSOF Ex. 18) (Revit's January 2009 performance review for which Henricks awarded her an overall score of 4.5 out of 5.0). In addition to giving Plaintiff high ratings in the January 2009 performance review, Henricks made comments that appear at odds with a retaliatory animus: "While Debra and I will disagree on some things[,] we have the ability to have a healthy debate and move on. Her input helps me make better decisions and I really appreciate her perspective." Doc. 114-8, at 7 (DSOF Ex. 18). If Plaintiff had engaged in similar protected activity in the past without producing any adverse employment action, Defendant argues, then "proximity in time no longer effectively connotes increased probability of interconnectedness between the adverse action and the protected activity." Doc. 113, at 15 (quoting *Cutrona v. Sun Health Corp.*, No. CV 06-2184-PHX-MHM, 2008 WL 4446710, at *17 (D. Ariz. Sept. 30, 2008)).

It is true that one of the primary facts supporting Plaintiff's causation claim is temporal proximity – she was terminated only 14 days after the April 23 meeting. In other contexts, courts have held that "[t]he causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *Miller v. Fairchild*

*Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir. 1986) (both concluding that an employee established an inference of causation by showing the employer's knowledge of the protected activity and the proximity in time between the protected action and the allegedly retaliatory employment decision). The Ninth Circuit has cautioned, however, that timing can show causation only when the termination "occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (internal citations and quotations omitted). The *Villiarimo* court held that a nearly 18-month lapse between protected activity and an adverse employment action "is simply too long, by itself, to give rise to an inference of causation." *Id.*  Here, the record indicates that Plaintiff made Defendant aware of some of her complaints at least a year before her termination. *See* Doc. 120-2, at 67 (Revit Depo. 84:15-19); *id.* at 65 (Revit Depo. 76:19-23).

Plaintiff admits that she made previous efforts "to correct all of the perceived misconduct over the years by encouraging the company to adopt 'best practices.'" Doc. 118, at 9. She recounts her discussion with Henricks at the April 23 meeting: "I said, 'Every single one of these things is a problem and I believe every single one of these things is against the law.' I said, '*I've been bringing these to you for a year* and I need you to work with me.'" Doc. 120-2, at 67 (Revit Depo. 184:15-19) (emphasis added). For example, with respect to Plaintiff's complaints about contingency fees, Plaintiff believed that First Advantage's charging of such fees "was contrary to statute and rule." Doc. 120-2, at 65 (Revit Depo. 175:6-7). She discussed her concerns with First Advantage's legal department in early 2008 and with Henricks "in early 2008 and late 2008, at the April 23rd meetings. I discussed it with her repeatedly." *Id.* (Revit Depo. 176:1-7); *see also id.* (Revit Depo. 176:12-23) (Plaintiff also discussed the issues with Henricks in January 2009)). The fact that Plaintiff raised these concerns long before the April 23 meeting – and did not suffer any form of retaliation – does cut against her argument that the timing of her termination gives rise to an inference of retaliation.

Plaintiff stresses, however, that she changed her approach at the April 23 meeting, and "for the first time[,] specifically reported that she believed the company was acting

illegally" by engaging in the activities identified above. *Id.* *See* Doc. 12-2, at 99 (Revit Decl. ¶ 17) ("In the April 23, 2009 meeting . . . I specifically asserted that First Advantage and its employees were violating the law by engaging in specific activities. Over the previous few years, I had attempted to get Henricks and others to change the company's practices and policies with respect to the substantive issues but I had not specifically called them out as violations of law[.]").  Thus, although Plaintiff agrees that she raised concerns in the past with Henricks, she raises a factual issue as to whether the April 23 meeting was the first time she had specifically called them out as violations of law.  The Court cannot conclude, as a matter of undisputed fact, that Plaintiff's earlier complaints to Henricks were the kind of protected activity she claims to have engaged in at the April 23 meeting – activity expressly covered by the AEPA. *See* A.R.S. § 23-1501(3)(c)(ii) (covering communications regarding violations of state law).

In addition, Plaintiff does not rely on temporal proximity alone to show causation. On April 21, 2009, Henricks approved Plaintiff's proposed termination of Frank Berardi, who had been underperforming with respect to management of his subordinates. Doc. 120-2, at 98 (Revit Depo. ¶ 14).  On April 24, 2009 – the day after Plaintiff raised her concerns about illegal activity at First Advantage – Henricks put the elimination of Berardi's position on hold.  Doc. 118, at 10; Doc. 120-2, at 105 (Revit Depo. ¶ 33). Plaintiff claims that later "Henricks told her boss Todd Mavis that she could not get rid of both Revit and Berardi at the same time because it would not be good for the tax business, and she had chosen to terminate Revit's employment."  Doc. 118, at 10-11; Doc. 120-2, at 9 (Henricks Decl. 337:25-338:4) ("[I]f we decide to move forward and terminate Debra [Revit's] position, then I would not, absolutely would not want to also eliminate Frank [Berardi's] position."); Doc. 119, at 42 (PSOF ¶ 493) ("Ms. Henricks explained to Mr. Mavis that she believes that Mr. Berardi's position should not be eliminated because Ms. Henricks 'can't afford to lose both of them at the same time.'"). Although this communication appears to have occurred after the April 26 email that Defendant claims to be the reason for Plaintiff's termination, the fact that Henricks put

the termination of Berardi on hold the day after the April 23 meeting at least suggests that she had decided at that time (before the April 26 email) to terminate Plaintiff.

Plaintiff also notes that Henrick's statements are not consistent in claiming that the April 26 email was the basis for Plaintiff's termination. For example, Henricks' April 30, 2009 email to Mavis, which purported to provide an overview of Plaintiff's situation and the reasons for her termination, did not mention the April 26 email. Doc. 115-3, at 8-9. Henricks instead described various alleged concerns regarding Plaintiff's performance, and mentioned "several confrontational conversations" with Plaintiff, including the April 23 meeting. *Id.* at 9.

Plaintiff claims that Defendant's retaliatory intent "is further established by the changing explanations for the termination." Doc. 118, at 12. At Plaintiff's unemployment compensation hearing on July 6, 2009, Henricks and Boan testified that the only reason for Plaintiff's termination was a Code of Conduct violation caused by her April 26 email. Doc. 119, at 43 (PSOF ¶¶ 494-95); Doc. 115-4, at 15-16, 18. Plaintiff argues that, in the instant motion for summary judgment, "Defendant has changed its tune and now claims that it was ongoing performance deficiencies that led to the termination" because there is evidence that "Defendant completely ignored its policy requiring an investigation of all alleged Code of Conduct violations, that no one but Henricks believed the email justified termination, and the lack of any evidence of an adverse effect on First Advantage from Revit's email." Doc. 118, at 12.

These arguments and factual assertions raise a genuine issue of fact as to whether the April 23 meeting was a substantial motivating factor in Plaintiff's termination. The Court cannot conclude as a matter of undisputed fact that Plaintiff has failed to carry her burden on the first prong of the causation test.

### 2. Second Step.

Defendant claims that it would have terminated Plaintiff in any event because of her April 26 email, which violated First Advantage's Code of Conduct by "openly endorsing inaccurate and disparaging comments and inappropriate questions about

executive management while simultaneously copying her entire staff and demanding a response." Doc. 113, at 16. Defendant emphasizes that "the termination was not the first time Revit received feedback about inappropriate communication style in the context of team dynamics," that she was "routinely counseled" on her tone, and that Henricks had coached Plaintiff on similar issues based on peer complaints and skipped meetings. *Id.*

Plaintiff does not dispute that her April 26 email violated her employer's Code of Conduct, but she argues that the Code of Conduct "requires an investigation whenever a violation is alleged" and that "neither Henricks nor anyone in human resources conducted an investigation[.]" Doc. 118, at 11. *See* Doc. 119, at 57 (PSOF ¶ 563) (quoting an excerpt of Tefft's deposition in which she states: "You clearly want to make sure you are in a situation where you know all the facts before you take any action, of course."). Defendant presents evidence, however, that its policy does not require a formal discipline process when circumstances, including Code of Conduct violations, warrant immediate termination. Doc. 120-1, at 8 (Tefft Depo. 25:11-21) (testimony from a former Chief of Human Resources for First Advantage explaining that Code of Conduct violations are "very serious" and do not require "normal progressive discipline").

Nor does Plaintiff deny the past performance deficiencies that Defendant raises, such as peer conflicts, overworked staff, favoritism, poor team morale, and financial underperformance. Instead, she argues that Henricks knew about these issues well before she gave Plaintiff an "outstanding performance appraisal" in January 2009 (Doc. 118, at 12), and that the issues therefore could not have been the reason for her termination.

The parties take opposing positions on Plaintiff's January 2009 performance review. Defendant points to the review to show that Plaintiff's past complaints about illegal activities did not result in adverse employment actions, decreasing the likelihood of a connection between her April 23 complaints and her termination. Plaintiff points to the review to show that her past performance deficiencies did not become an issue warranting formal discipline "until immediately after the April 23 meeting," increasing the likelihood that she was terminated because of her comments at the meeting. *Id.*

Plaintiff raises other arguments that cast doubt on Defendant's assertion that it would have terminated her in any event because of the April 26 email. As noted above, Plaintiff asserts that Henricks reversed course on the termination of Frank Berardi the day after the April 23 meeting, and later explained that she could not afford to lose both Berardi and Plaintiff. Plaintiff also notes that Henricks' April 30 email justifying Plaintiff's termination did not mention the April 26 email, and that Defendant allegedly has shifted in its explanation of reasons for her termination.

The Court concludes that Plaintiff has raised a genuine dispute of fact as to whether she would have been terminated on the basis of the April 26 email regardless of what she said on April 23. The Court therefore cannot grant summary judgment for Defendant on the second prong of the causation analysis.

**IV.     Common Law Wrongful Termination Claim.**

On April 6, 2011, the Court granted Plaintiff leave to amend her complaint and assert a common law claim for wrongful termination in violation of public policy. Doc. 34. While the Court recognized that a common law claim may be redundant of the AEPA claim to the extent that it is premised on retaliation for Plaintiff's reporting of law violations by Defendant, the Court decided that it could not, at that time, determine as a matter of law that a common law claim would be futile. *Id.* at 2-3. The Court advised Plaintiff, however, that "since the inception of the AEPA, common law wrongful discharge claims based upon public policy are limited, as the legislature now favors the comprehensive statutory scheme of the AEPA," and that Plaintiff "bears the burden of establishing a prima facie case with authoritative support therefor." *Id.* (quoting *Lombardi v. Copper Canyon Academy, LLC*, No. 09-CV-8146-PCT-PGR, 2010 WL 3775408, at *8 n.9 (D. Ariz. Sept. 21, 2010)).

In her response to the motion for summary judgment, Plaintiff makes clear that her common law claim is based on the same conduct as her AEPA claim – the statements she made during her meeting with Henricks and Boan on April 23, 2009. Doc. 118 at 16-18. The Arizona Supreme Court recognized in *Wagenseller v. Scottsdale Memorial Hospital*,

710 P.2d 1025 (Ariz. 1985), that an employer may be held liable for civil damages if the employer discharges an employee for a reason that is against the public policy of Arizona. "[T]he AEPA was enacted in direct response to *Wagenseller* and with the intent of limiting the availability of wrongful termination for the violation of public policy." *Galati*, 69 P.3d at 1014. Whatever categories of wrongful termination might survive under *Wagenseller* after enactment of the AEPA – an issue that has not been decided by Arizona courts – this Court cannot conclude that they include actions for the same conduct covered by the AEPA. To so hold would mean that any strictures placed by the AEPA on claims arising from particular conduct could simply be disregarded by repackaging the claims under *Wagenseller*. Such an interpretation would have absolutely no limiting effect on *Wagenseller*, and therefore would be clearly contrary to the intent of the AEPA. *Id.* Because Plaintiff does not assert a common law claim based on conduct other than the April 23 meeting, the Court concludes that she does not have an independent common law claim for wrongful termination.

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 112) is **granted** with respect to Plaintiff's common law claim and **denied** with respect to her AEPA claim. The Court will set a final pretrial conference by separate order.

Dated this 12th day of April, 2012.

_____
David G. Campbell
United States District Judge